# 24-2068

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

DENNIS P. MAHER, MARY E. MAHER RESIDUARY TRUST,

*Plaintiff-Appellees,*

—against—

GLOBAL FACTORS, LLC and RALPH C. JOHNSON,

*Defendants-Appellants.*

—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS

BRIAN D. GRAIFMAN
BORAH, GOLDSTEIN, ALTSCHULER,
NAHINS & GOIDEL, P.C.
377 Broadway, 6th Floor
New York, New York 10013
(212) 431-1300

*Attorneys for Defendants-Appellants*

Dated: November 18, 2024

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ............................................................. iii

CORPORATE DISCLOSURE STATEMENT ............................ 1

STATEMENT OF JURISDICTION ...................................... 2

STATEMENT OF THE ISSUES ......................................... 3

STATEMENT OF THE CASE ............................................ 5

    A. Factual Background ............................................. 10

      1. Global Factors ................................................ 10

      2. Plaintiffs' Investment and pre-COVID
         distributions ............................................... 12

      3. AGF-II and Wall Street Pizza ............................. 13

      4. COVID Pandemic ........................................... 19

      5. Post-COVID Liquidation or Conversion Choice .......... 21

      6. Wall Street Pizza Advances All Credited to Global
         as Part of Liquidation and Conversion (and Still
         Collateralized) ............................................ 24

    B. Procedural Background ......................................... 27

      1. This Action .................................................. 27

      2. The Bench Trial ............................................. 29

         (a) Pre-trial Proceedings ................................... 29

         (b) Trial Overview .......................................... 30

         (c) Select Relevant Testimony .............................. 31

            (i)   Witness & Testimony Overview ................... 31

i

PAGE

  (ii) Specific Relevant Testimony......................... 32

  3. The Court's Opinion & Order ................................. 35

  4. The Judgment and This Appeal ............................ 44

SUMMARY OF ARGUMENT............................................. 44

 POINT I (SUMMARY) .................................................. 44

 POINT II (SUMMARY) ................................................. 45

THE STANDARD OF REVIEW ........................................... 46

ARGUMENT................................................................. 47

I. THE DISTRICT COURT CLEARLY ERRED IN
 DETERMINING THAT THE FUTURE RECEIVABLES
 AGREEMENTS WERE A SHAM AND ERRED IN
 DETERMINING THAT ANY FAILURE TO DISCLOSE
 CONSTITUTED A MATERIAL OMISSION ...................... 47

II. PLAINTIFFS FAILED TO PROVE LOSS CAUSATION
 AND THE COURT ERRED BY DETERMINING
 RECISSORY DAMAGES ................................................ 52

 A. The Loss and Damages Assessed Were Not Caused By
  or Proportional to the Risk Allegedly Concealed ........... 55

 B. The Loss and Damages Assessed Were Not
  Reasonable Foreseeable......................................... 58

CONCLUSION ............................................................... 59

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

10012 Holdings, Inc. v. Sentinel Ins. Co.,
    21 F.4th 216 (2d Cir. 2021) .......................................... 55

Another Planet Entm't, LLC v. Vigilant Ins. Co.,
    15 Cal. 5th 1106, 320 Cal. Rptr. 3d 843, 548 P.3d 303
    (2024) ................................................................ 50

Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-
    Kazyna JSC,
    No. 20-2805-cv, 2022 U.S. App. LEXIS 1271
    (2d Cir. Jan. 18, 2022) ................................................ 53

Bastian v. Petren Res. Corp.,
    892 F.2d 680 (7th Cir. 1990), *cert. denied*, 496 U.S. 906
    (1990) .............................................................51, 56

CAP CALL, LLC v. Foster (In re Shoot the Moon, LLC),
    No. 2:15-bk-60979-WLH, 2020 Bankr. LEXIS 3157
    (Bankr. D. Mont. Nov. 6, 2020) ...................................... 49

Consol. Rest. Operations, Inc. v. Westport Ins. Corp.,
    41 N.Y.3d 415, 211 N.Y.S.3d 800 (2024) .......................... 55

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994) .......................................53, 54

Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.,
    217 Vt. 195, 287 A.3d 515 (2022) ................................... 50

Itria Ventures LLC v. Chadha (In re Chadha),
    598 B.R. 710 (Bankr. E.D.N.Y. 2019) .............................. 49

Langhamer, et al, v. Johnson, et al.,
    1:22-cv-05404-JLR (S.D.N.Y.) ....................................... 13

Lauder v. First Unum Life Ins. Co.,
    284 F.3d 375 (2d Cir. 2002) .......................................... 46

iii

PAGE(S)

Maher v. Glob. Factors LLC,
  No. 22-cv-6505 (LJL), 2024 U.S. Dist. LEXIS 121966,
  2024 WL 3356985 (S.D.N.Y. July 8, 2024).............................. 5

MVP Health Plan, Inc. v. OptumInsight, Inc.,
  765 F. App'x 615 (2d Cir. 2019) ..................................... 46

SEC v. Rashid,
  96 F.4th 233 (2d Cir. 2024)........................................... 46

**Statutes**

28 U.S.C. § 1291.......................................................... 3

28 U.S.C. § 1332.......................................................... 2

28 U.S.C. § 1331.......................................................... 2

28 U.S.C. § 1367.......................................................... 2

Exchange Act § 27 (15 U.S.C. § 78aa) ..................................... 2

Securities Exchange Act of 1934 § 10(b)
  (15 U.S.C. § 78j(b)) ........................................... 2, 27, 41

Securities Exchange Act of 1934 § 20(a)
  (15 U.S.C. § 78t(a)) ....................................... 2, 27, 41, 42

**Rules**

FRAP 4(a)(1)(A)........................................................... 3

FRAP 26.1................................................................. 1

**Regulations**

17 C.F.R. § 240.10b-5................................................. 2, 27

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and in its spirit, defendant-appellant Global Factors LLC states that it has no parent corporation and that no publicly held corporation is a member holding a 10% or more share in it.

## STATEMENT OF JURISDICTION

Plaintiffs' claims below (Case No. 22-cv-6506-LJL, S.D.N.Y.) arose under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). The District Court had federal question jurisdiction pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1331, and supplemental jurisdiction over state claims under 28 U.S.C. § 1367.[1]

The court below issued a Judgment entered July 9, 2024, awarding plaintiffs a money judgment of damages in the amount of $828,917.83 against the defendants jointly and severally (SA1-69), based on a July 8, 2024, Opinion and Order (SA70) by Lewis J. Liman, constituting findings of facts and conclusions of law upon a bench trial he conducted.

---

[1] Plaintiffs also assert diversity jurisdiction under 28 U.S.C. § 1332, with the matter in controversy exceeding $75,000, exclusive of interest and costs, and plaintiffs claiming to be residents of the State of Washington, defendant Ralph C. Johnson ("Johnson") residing in New Jersey, and defendant Global Factors, LLC ("Global") a limited liability company organized under the laws of Wyoming, with its principal place of business in New York and Johnson as its sole member (JA181-182 ¶ 2).

This Court has jurisdiction under 28 U.S.C. § 1291 over this appeal by defendant-appellants Global Factors, LLC and Ralph C. Johnson from the Judgment, as it is a final order, resolving all issues.

The appeal is timely. The Judgment was entered July 9, 2024 (SA70) and the Notice of Appeal was filed August 5, 2024 (SA71), within 30 days of entry of the Judgment, timely under FRAP 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1.     (a) Whether the district court erred in determining that defendants-appellants – a business and its manager's principal – which provides accounts receivable factoring and related financing to small businesses, and which collapsed after the COVID-19 pandemic, committed civil securities fraud and common law fraud upon plaintiffs-appellees, investors, based principally on $295,000 of advances to a restaurant about to open owned by an investor in an affiliated entity, where the advances were fully collateralized by the restaurant owner's balance of more than $2 million in the related entity, the advances constituted only a small portion of the approximate $14.4 million in outstanding advances, and the PPM gave the manager full discretion to enter into such agreements; and (b) whether the failure to disclose the

3

particulars of that arrangement was material where after the Covid pandemic plaintiff raised questions but never proved that the amount collateralized in the affiliate entity was not eventually credited to the entity in which plaintiffs were members (*see* Point I).

      2.    Whether the district court properly found, and plaintiffs carried their burden of proving, loss causation to the extent of awarding plaintiff-appellees full rescissory damages for their pre-COVID investment in small business accounts receivables factoring, effectively immunizing them from the economic effects of COVID on their investment, where the factoring business was materially impacted by the COVID-19 shutdowns, forcing its small business customers to be unable to repay their advances in a timely manner, the loss to the business and its investors thus having nothing to do with the alleged fraudulent loan for $295,000 out of an approximate $14.4 million in outstanding advances and where plaintiffs' investment was only *six percent* of the total members investment ($1,002,000 of $16,691,189) and the loss and damages granted were not reasonably foreseeable to defendants-appellants when that questioned agreement was entered into, prior to plaintiffs' investment (*see* Point II).

4

## STATEMENT OF THE CASE

Defendants-appellants Global Factors, LLC ("Global") and Ralph C. Johnson ("Johnson") appeal the Judgment entered July 9, 2024 (SA70), awarding plaintiffs-appellees Dennis P. Maher ("Maher") and the Mary E. Maher Residuary Trust (the "Trust") a money judgment of rescissory damages in the amount of $828,917.83 against the defendants jointly and severally, based on a July 8, 2024, Opinion and Order (SA1-69) constituting findings of facts and conclusions of law following a three-day bench trial.[2]

We summarize the case here, set forth in more detail in the factual section with record citations. Global was a company that helped business owners grow through accounts receivable factoring financing. Johnson was approached by one of his investors in a prior fund, Randy Langhamer, who sought to redeem his investments to pay for a build-out of a Los Angeles restaurant he was opening (Wall Street Pizza), only he was untimely in the notice provisions to redeem.

---

[2]    Opinion at *Maher v. Glob. Factors LLC*, No. 22-cv-6505 (LJL), 2024 U.S. Dist. LEXIS 121966, 2024 WL 3356985 (S.D.N.Y. July 8, 2024).

Johnson offered to advance payments through Global's future receivables purchase agreements, eventually $295,000, collateralized by the over $2 million balance that Langhamer had in the other fund, which Johnson controlled. As a result, Wall Sreet Pizza opened and is operating today (JA689, Tr. 429).[3]

Following the advances to Wall Street Pizza, at the end of 2018, Maher invests $1,002,000 in Global (comprising an approximate six-percent share of Global investments). In March 2020, the COVID-19 pandemic hits, devastating Global's customer base, causing it to suspend distributions.

As the recovery from the pandemic shutdown begins, Johnson pivots and creates a new fund, Propellus Inc., to fund essential businesses in need of financing and serve an urgent public need during an unprecedented trying time with large swaths of the public still behind closed doors. Global's managers are forced to liquidate Global, but offer investors a conversion option into Propellus. Langhamer's

---

[3]     While not part of the record, its website indisputably is Wallst.pizza.com, displaying images of its restaurant and offerings.

6

investments are similarly liquidated and offered the conversion into Propellus.

Almost all of Global's investors accept the conversion. Maher declines it.

Disappointed with the Global investment, Maher sues, and a bench trial ensues. All of his claims are denied except his last one, focusing on Wall Street Pizza.

The court awards plaintiffs back the full value of their investment, minus distributions received, thus $828,917.83 against defendants jointly and severally. The court expresses skepticism over the concept of future receivables for an establishment that does not yet have receivables, even though the advances here were secured almost ten times over by Langhamer's investments controlled by Johnson. The court brands the Wall Street Pizza advances a scam, a means for Global to pay back Langhamer for an investment owed to him by a prior fund.

Plaintiffs though never addressed or even tried to demonstrate that the Langhamer collateral was never credited to Global (or by then, Propellus as part of the conversion). The only evidence concerning that was Johnson's unrebutted testimony on defendants' case that the

7

Langhamer debit and Wall Street Pizza receivable was kept on the books of both entities at 100%, for which the Global investors were given full credit during the liquidation, undiluted (JA723-724, Tr. 463-464; JA726, Tr. 466).

The court found that plaintiffs would not have invested in Global had they known the nature of the Wall Street Pizza advances – even though the $295,000 was only a small portion of $14.4 million in Global's customer advances. The court awarded plaintiffs full rescissory damages, constituting the remainder of their entire Global investment.

The court erred in determining that the Wall Street Pizza advances were improper and that any failure to disclose them constituted a material omission. They were indisputably fully collateralized, probably the most secure of advances possible. And even if one indulges the notion, counter to the undisputed evidence, that the receivable was not fully credited to Global during the liquidation after the effects of the pandemic, any diversion by then would not extend back to the time that plaintiffs invested so as to constitute a material omission that had they known they would not have invested.

8

The court awarding the plaintiffs back their full investment was improper as well under a loss causation analysis for a number of reasons, including that it immunized them from the economic effects of the Covid pandemic – effectively gifting them a get-out-of-pandemic-free card – even though they had chosen to invest in financing of small businesses.

Nor is the award proportional to the loss, as case law requires. The $295,000 comprises only *two percent* of the $14.4 million outstanding advances and plaintiffs comprised only *six percent* of the Global investor base of $16,691,189 (JA1302). The $295,000 under either scenario should at best be divided *pro rata* for plaintiffs to obtain their proportional share, or under respective calculations, $20,040 or $17,700.

Finally, the loss and amount awarded was not reasonably foreseeable when the fully-secured advances were made. There was either no loss to Global because the Wall Street Pizza advances, fully collateralized, were paid, or at worst there was collateral that unfortunately *due to Covid* became impaired.

The Judgment thus cannot stand.

9

A. **Factual Background**

We include only the facts necessary for the appellate issues raised.

1. **Global Factors**

Global Factors "was formed to offer small businesses a variety of financing alternatives including payroll advances directly and through third-party professional employer organizations, accounts receivable factoring, short-term line of credit loans, and other types of loan products and cash flow financing in the discretion of the Manager." (May 16, 2016 Private Placement Memorandum ("PPM") (JA29-117, JA14 ¶ 15, *citing* JA 37-38).

The PPM warned that the investment was speculative with a high degree of risk, one could lose their entire investment, and there was no public trading market (JA41). Investments were offered only to accredited investors (JA31).

Per the PPM, advances could be made "as determined by the Manager in its sole discretion" (JA37). It disclosed that the Manager, and particularly Mr. Johnson, had inherent conflicts of interest, "some of which may be carried out on behalf of competitors or *customers* of the Company" (JA46 (emphasis added)), and the obligors would be small

10

businesses with financial attributes substantially less desirable than

larger companies and which "may lack strong operating history and

predictable cash flow" (JA43):

> ***The Manager and related persons and entities have
> conflicts of interest with the Company***. The Manager,
> the members of the Board of Managers, and entities
> controlling or controlled by the Manager and its members,
> have interests that conflict with those of the Company.
> Such persons and entities engage in a wide variety of
> activities, some of which may be carried out on behalf of
> competitors or customers of the Company. Ralph C.
> Johnson, principal of the Manager, is also an equity
> owner and member of the board of managers of the
> entities that manage other portfolios of Advances and
> loans. These entities share similar philosophies and goals,
> and therefore each such entity has a conflict of interest
> with the others, including the Company, in terms of
> making similar Advances on attractive terms to
> creditworthy borrowers. The Company will share
> opportunities for Advances with these other entities in
> such amounts and in such manner as determined by the
> Manager and its affiliates in their sole discretion.

(JA46 (emphasis in original))

> ***The Company will generally make Advances to
> small businesses, which may involve a high degree
> of risk as compared to larger borrowers.*** The small
> businesses that will be the Obligors under the
> Company's portfolio of Advances are likely to have credit
> ratings and other financial attributes that are
> substantially less desirable than larger companies and
> that do not conform to conventional loan standards
> applied by traditional lenders. For example, the
> Company's Obligors may typically have a higher degree of

11

leverage on their balance sheets, and may lack strong
operating history and predictable cash flow.

(JA43 (emphasis in original))

Global's portfolio held approximately $14.4 million in customer advances (SA-8, JA980-981).  Investor balance was $13,757,967.13 (JA970) before Maher invested and $16,691,189 (JA1302) after he invested.

### 2. **Plaintiffs' Investment and pre-COVID distributions**

Maher is a sophisticated and accredited investor with over 30 years of investment experience, a net worth in excess of five million dollars, and annual income in excess of $100,000 (JA780-783, JA789). He received the PPM in or about August 2018 (JA195 ¶ 5).  After various emails and telephone calls between him and Johnson (JA196 ¶ 7), he invested.  In so doing, he identified his investment objectives as Capital Appreciation and Speculation, not checking the boxes for income or preservation of capital (JA781, JA785, JA789).

Between October and December 2018, Maher made three purchases of Global shares totaling $1,002,000 (two for his IRA and one

for the Trust).[4]

From December 2018 to February 2020, the Maher IRA received distributions of $109,683, reinvested into Global; and the Trust received $66,650.00 in distributions from its Global Class B shares (JA196 ¶¶ 12-13).

### 3. **AGF-II and Wall Street Pizza**

American Growth Funding II (AGF-II) is a prior fund run by Johnson. It and Wall Street Pizza are not much part of the Global Factors story other than that two investors aggrieved by the impact of the Covid pandemic on their accounts receivable investments have made it so: Maher here, and Randy Langhamer, a Wall Street Pizza owner and AGF-II investor who prior to his testimony had filed *his own* investment suit (along with his family and friend) against Johnson, AGF-II, and others.[5]

---

[4]     Those investments were (i) on October 10, 2018, for his IRA, 5,230 Class A Preferred shares of Global for $523,000.00 (later converted to Class B shares of equal value); (ii) on November 12, 2018, for the Trust, 4,300 Class B shares of Global for $430,000; and (iii) on December 15, 2018, for his IRA, an additional 490 Class B shares of Global for $49,000.00 (JA196 ¶¶ 8-11).

[5]     *Langhamer, et al, v. Johnson, et al.*, 1:22-cv-05404-JLR (S.D.N.Y.).

13

Langhamer had known Johnson since 1998, over a quarter century (JA690, Tr. 430). Langhamer had invested in AGF-II and claimed he was due redemptions of more than $2 million (JA693 & JA723, Tr. 433 & 463).[6] He requested a redemption because he needed money for restaurant he was building, Wall Street Pizza (JA695, Tr. 435 ("I was building the restaurant, and I needed the money that was due to me.")).

As Langhamer concedes, Mr. Johnson came up with a mutually advantageous creative solution: Global could finance the restaurant by purchasing the future receivables, with the interest charged by Global to be offset by the interest received from AGF-II, and "it would be a wash" (JA695, Tr. 435).

Global entered into five Future Receivables Purchase Agreements with Wall Street Pizza, distributing $295,000 in total (SA-18). Plaintiffs placed two of those agreements into evidence, the first effective July 19, 2017, Global paying $75,000 for $85,000 in future receivables (JA1470-1480), the second effective August 8, 2018, Global

---

[6]     Langhamer and his family had about 16 different accounts at issue (JA723, Tr. 463), which we address here as Langhamer's account.

paying $39,000 for $35,000 in future receivables (JA1481-1493).[7]  These

are form agreements, with blanks typed in.  Global's counterparties on

each are "Wall Street Pizza . . . a California Limited Liability Company"

and "Debra Langhamer" (Randy Langhamer's wife).

In sum and substance, the agreements assign, sell, and transfer to

Global all the merchant's right, title and interest in its future

receivables.[8]  Each contains an Affidavit of Confession of Judgment

executed by Ms. Langhamer, confirming that she owns and operates the

merchant Wall Street Pizza LLC, giving the address in the initial

notarized form as 11955 W Washington Blvd., Los Angeles, CA 90066.[9]

---

[7]  The five agreements spanned from predating to postdating Wall
Street Pizza's opening in March 2018 (*see* SA20).

[8]  The agreements also give Global, in its sole and absolute
discretion, the right to debit from the merchant's account a specified
percentage of the merchant's settlement amounts due from each
transaction daily, or a specified daily dollar amount (*id.* ¶ 1.01). There
is also a $99 administrative fee due to Global which in its sole discretion
it can deduct from the purchase price.  The latter agreement (closer in
date to the opening) also includes her signed ACH Authorization Form
(JA490), authorizing Global to initiate debit and/or credit entries from
the merchant's ACH account.

[9]  A GOOGLE MAPS search of this address just prior to submitting
this brief displays street-view images of Wall Street Pizza occupying the
ground-floor corner premises with indoor and outdoor seating (listing
images captured May 2024).

15

Ms. Langhamer initialed and dated each page of the agreements, and/or dated and signed them.

As Mr. Johnson testified, future receivables are any and all monies collected during the ordinary course of the business's operations, which could be credit card transactions, cash, and from any such activities, including catering or day-to-day selling food (JA720, Tr. 460). Langhamer, after initially giving contrary testimony for plaintiffs that there were no receivables (JA699, Tr. 439), on cross-examination confirmed that Wall Street Pizza engages in credit card transactions and that there were receivables (JA710, Tr. 450). In any event, this is almost a moot point because here the collateral for the advances was tangible: the funds due the Langhamers from their AGF-II investments (JA581-584, Tr. 321, 323-324; JA722, Tr. 462). As Johnson testified, unrebutted:

> A. It was fully collateralized by his investment in AGF.
> . . .
> Q. So it's my understanding here is what you're saying that if Wall Street Pizza were not to make any payments on this contract, Global would be paid from AGFII?
>
> A. Basically there's a payable on the balance sheet and a receivable on the balance sheet. They basically cancel each other out.

16

If the receivable was paid in full, then we would pay the payable. If the receivable was not paid in full or in part, we would then satisfy the balance of that with a payable. The net effect would be the same.

(JA581, Tr. 321)

Q. . . . If Mr. Langhamer does not repay the $85,000 from Wall Street Pizza contract, his redemption from AGFII would be reduced by $75,000?

A. That's the nature of collateral, yes.

Q. So essentially his distribution from AGFII was paid through this contract from Global, correct?

A. Not yet. He has an opportunity to pay it. But if he doesn't, we have the collateral. It's like any other collateral that we have with any other merchant as you just read in the security interest part of the contract.

(JA584, Tr. 324)

Langhamer conceded that the collateral for Global financing Wall

Street Pizza included the AGF-II funds due to him:

Q. The monies owed by American Growth Funding to you regarding your investments were used as collateral for the loans Global Factors made to Wall Street Pizza; isn't that right?

A. Correct.

(JA705, Tr. 445)

17

Moreover, the PPM, in addressing conflicts of interest, authorizes such cross-collateralization between affiliates concerning advances, loans, and other transactions:

> The Company will share opportunities for Advances with these other entities in such amounts and in such manner as determined by the Manager and its affiliates in their sole discretion.

(JA46)

> The Manager will regularly encounter opportunities for advances, loans, investments and other transactions that are appropriate for both the Company and for any or all of such other entities. The Manager and its affiliates will use their sole discretion in allocating the right to participate in such transactions to the Company and such other entities, and from time to time the Company and one or more of such other entities may participate jointly in any of such transactions, whether pursuant to formal or informal participation agreements or on any other basis determined by the Manager, with the level or amount of such participation being determined based on factors deemed relevant and appropriate by the Manager and/or its affiliates in their sole discretion, including without limitation the amount of available cash resources of the Company and such other entities, the manner in which and the extent to which prior opportunities were allocated among the Company and such other entities.

(JA450)

We show below that (i) the amounts due by Wall Street Pizza to Global, which were fully collateralized, were given fully value in the

18

post-Covid conversion and liquidation of Global; and (ii) the Langhamers' interest in AGF-II as part of that conversion and liquidation was credited to Global, *meaning that there was therefore no loss to Global investors, including the plaintiffs, resulting from the Wall Street Pizza transactions.*

But first a Covid interruption:

### 4. **COVID Pandemic**

Blunting the country in March 2020, the COVID-19 pandemic had a "devasting effect on a vast majority of small businesses in every sector throughout the country." Obviously, it "greatly impacted Global's business, by causing a major interruption to its portfolio companies, and thus negatively impacting these companies' viability and their ability to repay their outstanding obligations owed to Global" (Notice of Liquidation & Exchange Offer, JA123).

Global ceased all distributions to investors on March 20, 2020, including those to the Maher IRA and the Trust (JA196 ¶ 14). Global kept its investors updated on the status of the business (*e.g.*, JA1121-1124, JA1129-1133, JA1284-1295). Its May 12, 2020 update advised that

19

> [w]ith the current government lock-down still in effect,
> only a small percentage of our small business customers
> are open and conducting any meaningful business. . . .
> While we originally hoped for a ninety-day period of
> limited inactivity and thusly a moratorium on all interest
> paid to capital accounts, it appears we may be in for [it]
> slightly longer . . . ."

(JA1129)  Maher confirmed he understood the problem and made

suggestions for how to address the issue (JA1125-1128, JA1134-1137).

He acknowledged:

> With the anniversary of my B/C purchases occurring later
> in the year, I would be a "winner" if you fail to follow the
> PPM, at least with regards to my annual B/C
> distributions. Those who've missed their annual
> distributions during this COVID-shut-down would
> certainly have a valid beef if theirs are missed but I get
> mine.

(JA1134)

As 2020 continued, along with the global pandemic, albeit

lessened, the repayments by Global's clients did not improve in any

significant way, and Global was in danger of filing for bankruptcy

(JA654, Tr. 394).  It is unrebutted that that would have caused its

investors, including the plaintiffs, to lose the entire value of their

investment, or close to it.

20

### 5. **Post-COVID Liquidation or Conversion Choice**

As a result, Global's Board of Managers on November 23, 2020, wrote to the shareholders (JA1284-1295) with a Notice of Liquidation and Exchange Offer, stating they had determined that "it is in its Members' best interest to unwind and liquidate Global" and allow its members the opportunity to exchange the units for those of a newly formed entity, Propellus Inc., "an Essential Businesses Alternative Financing Fund" (JA1284).

As plaintiffs concede, the AGF-II shareholders received a similar letter at this time mirroring that AGF-II was being liquidated due to the Covid pandemic and proposing an exchange Propellus shares (Compl., JA16, ¶ 28; Am. Answer, JA168 ¶ 28 (admitting)).

Propellus was formed "as a result to the economic situation created by the Covid-19 pandemic" and "intends to offer essential small businesses a variety of financing alternatives, including merchant cash advances and payroll advances directly and through third-party professional employer organizations, accounts receivable factoring, short-term line of credit loans, and other types of loan products and cash flow financing in the discretion of the Company" (JA1284).

21

Essentially, management decided to make lemonade from lemons and assist essential businesses in urgent need of cash for societal good. The proposal offered bonus shares and warrants in the new entity and a plan for it to merge into an existing public company (JA1284).

As Johnson explained:

> We could have just filed for bankruptcy and just liquidated the company and moved on.
>
> The exchange agreement was an option that we created that was voluntarily, but we wanted to show the investors that, hey, we have come up with a way that we believe we can accelerate the recovery of the value of everyone's assets by changing the structure from a debt instrument to an equity instrument giving you free shares, going public, paying you dividends. Combining all of these things together, we feel that gives you a better chance for recovery than simply sitting around filing bankruptcy, hoping that Covid doesn't put people out of business permanently and see what we can collect over the next decade. And the overwhelming response to the exchange offer was that nearly everyone exchanged.

(JA654-655, Tr. 394-395)[10]

---

[10]    Johnson also explained that in so doing he gave up his 90 percent equity in Global, divided it up amongst the investors, gave them equity in a newly formed entity, took that entity public, gave them free common shares, gave them warrants, extended the expiration date on the warrants, allowed them to convert at a discount to the market, and then paid them a higher valuation during the exchange (JA536, Tr. 276).

22

The methodology of the exchange, simplified, involved a liquidation, as stated in the Notice of Liquidation and Exchange Offer (ja1284-1295), of Global by Propellus as trustee, valuing receivables that have made *any* payments to Global within the set period at 100% of face value, and those that made *no* payments during that period at $0, and then using the pro rata share as valuation, including to apply to the par value of Propellus for exchanging members, and then a subsequent revaluation to determine the redemption value, and which will be used to dictate final valuation and, for Propellus members, to determine their next dividend payment (JA1289).  By way of the liquidation, all Global assets are transferred to Propellus for the benefit of all Global members, whether exchanging or not, which means for those who continue with Propellus shares that the any subsequent collection on the transferred assets belong to Propellus (JA1292).  Approximately 195 of 200 Global investors agreed to the exchange (JA536, Tr. 276; JA655, Tr. 395).

Maher rejected the offer and chose to have plaintiffs' shares liquidated (ECF 39 at 16 ¶ 17).  From August 2021 to June 2022,

23

the Maher IRA received $65,550.63 in connection with the

liquidation of its Global shares, and the Trust received $40,881.54

in connection with the liquidation of its Global shares (JA197

¶¶ 18-19).

On or about October 15, 2021, Maher received a Final

Distribution Memorandum from Propellus for his IRA and one for

the Trust, reciting that the IRA was owed $67,257.35 and the

Trust was owed $42,425.36 (JA1408-1411).  Each of the

memoranda contained a general release to be executed by Maher,

which he declined to execute.  His final distributions thus have

not been made (SA17).

### 6. Wall Street Pizza Advances All Credited to Global as Part of Liquidation and Conversion (and Still Collateralized)

In the meanwhile, as stated above, the Langhamers were due

more than $2 million from AGF-II (JA693, Tr. 433; JA723, Tr. 463),

fully collateralizing the Global advances (which were in the principal

amount of $295,000). Langhamer accepted the Propellus conversion

from AGF-II, which was on similar terms as the Global exchange

(JA724-725, Tr. 464-465), and so that collateral remains.

More to the point, though, as part of the liquidation and conversion, as Johnson testified unrebutted, the receivable from Wall Street Pizza was credited at full actual value as having been fully collateralized and Propellus paid the Global shareholders for it at 100% of value, unimpaired (JA723, Tr. 463; JA726, Tr. 466), so "there was no net ill effect to any Global investor by the moneys owed by Wall Street Pizza" (JA724, Tr. 464). Moreover (although not relevant to plaintiffs here, who declined the conversion), Propellus has filed a collection suit against Wall Street Pizza (JA580-581, Tr. 320-321; JA726, Tr. 466).

Langhamer, who testified as plaintiffs' witness, had a different version of events – but even more advantageous for the defendants here *vis-à-vis* the Mahers. According to him, his redemption due from AGF-II was applied to pay back the Global advances:

> [I]n January of '21 when we did the Propellus conversion or exchange, my outstanding balance that was owed [by AGF-II] was reduced by the advances or the redemptions that Mr. Johnson made me through Global Factors. So my balance was reduced before it was haircutted by the amount that was redeemed to me.

(JA701, Tr. 441)

> Q. And then when those loans became due to Wall Street Pizza, there was the monies owed to you from American

25

Growth Funding got applied to the loans that were due in Global Factors, right?

A. There was no due date when those redemptions or Global Factors loans were made. It was open-ended.

Q. But there was that application of the monies you were owed from American Growth Funding to the moneys you owed collectively to Global Factors?

A. Correct. It was told to me as it was a wash.

Q. So Global Factors -- your obligations to Global Factors according to your testimony have been satisfied, right?

A. Yes.

(JA705, Tr. 445)

Under this version, all of Wall Street Pizza's balance to Global (now Propellus) has been satisfied. Defendants dispute this version and believe Mr. Langhamer posits it prophylactically to defend the collections case brought against Wall Street Pizza (JA580, Tr. 320; JA726, Tr. 466) and the Propellus collections case. But the significance here is that under either version, no harm exists to the Global shareholders, including the plaintiffs here, as a result of the Wall Street Pizza contracts, as opposed to the repercussions of the Covid pandemic.

26

B. **Procedural Background**

1. **This Action**

Plaintiffs filed this action on August 1, 2022, with a complaint asserting claims for (i) securities fraud under § 10(b) of the Exchange Act and Rule 10b-5; (ii) control person liability under § 20(a) of the Exchange Act; (iii) negligent misrepresentation; and (iv) fraud (JA12-28).

Plaintiffs allege various misrepresentations underlying these claims, including:

- Global earned in excess of 24% annually on its investments, including overstating the returns and understating the time period of repayments from Global's customers (Compl. Pgs. 6-8 ¶¶ 35-41);

- financial statements provided to Maher overstated Global's financial strength (pgs. 8-11 ¶¶ 42-58); and

- Johnson misstated facts regarding an SEC action against him (pgs. 11-12 ¶¶ 59-62).

The court rejected all of these claims after trial (SA30-43).

The complaint includes an additional claim that Johnson misstated the nature of Global's business because Global had provided funding to Wall Street Pizza, owned by Langhamer, an investor in Johnson's previous investment fund, AGF-II, and did so in lieu of

27

AGF-II redeeming Langhamer's investment in that fund, without requiring Wall Street Pizza to provide Global with any collateral, financial statements, personal guarantee, or any payments on the Wall Street Pizza contract (JA23-24 ¶¶ 63-67).  The complaint states that Maher was not told that his investment would be used to pay investors in Johnson's other companies, and that had Maher known, he never would have invested the amount he did in Global (JA24-25 ¶¶ 67-68).

The court after trial found validity in these Wall Street Pizza allegations, even though the PPM allows the manager sole discretion on financing, allows funding to customers who have other business relationships with the managers, that the managers manage other portfolios involving persons to whom advances may be made and that inherent conflicts of interest do exist (JA37, JA43, JA46), and that, as Johnson testified, Global was better than collateralized on the funding due to the AGF-II cash withheld on the redemption owed to Langhamer, and Langhamer confirmed that he owned and operated Wall Street Pizza, then under construction, was in need of cash, which is why he wanted to use his AGF-II investment, and that his AGF-II investment

28

for which he was owed over $2 million served as collateral for the $295,000 in advances (*e.g.*, JA715, Tr. 445; JA581-584, Tr. 321-324)

The complaint includes various exhibits, including the PPM (JA29-117), the Notice of Liquidation and Exchange Offer (JA118-129), emails, and financial statements.

Defendants filed an amended answer on November 9, 2022 denying the relevant allegations and asserting defenses (JA165-180). Among the defenses are that any damages suffered by plaintiffs were the direct and proximate result of intervening and superseding events over which the defendants had no authority or control and for which they are not responsible, or were caused by unrelated third parties, for which the plaintiffs are not entitled to recover from the defendants (JA178-179 ¶¶ 10 & 13-14).

### 2. **The Bench Trial**

#### (a) **Pre-trial Proceedings**

The parties consented to a bench trial (JA191 ¶ 4). They proposed a pre-trial order on January 19, 2024 (JA181-207), including a statement of stipulated facts (JA195-197) and list of proposed exhibits

(JA198-203).[11]  A pretrial conference occurred on January 30, 2024 (JA8 (docket sheet entry)).

### (b)  Trial Overview

Trial was held before Judge Liman on February 5, 6, and 7, 2024 (Tr. 1-204, 205-403, and 404-519 (JA261-463, JA464-663, and JA664-1522)).  Testifying on plaintiffs' direct case were Mr. Maher (JA264-444), Mr. Johnson (JA444-689), Christopher John Rossi (JA609-623), and Randy Langhammer (JA689-715).[12]  Defendants recalled Mr. Johnson on their defense case (JA719-728).[13]

Exhibits PX-1 through PX-86, PX-88 through PX-91, PX-95 and DX-1 were admitted into evidence (reproduced at JA780-1571).[14]

---

[11]     Each side also provided proposed findings of facts and conclusions of law (JA208-228 & JA229-239), plaintiffs' thereafter amended (JA240-260).

[12]     **Maher** direct (Tr. 4-120), cross (Tr. 120-174), redirect (Tr. 174-182), and recross (Tr. 182-184); **Johnson** direct (Tr. 185-363), cross (Tr. 363-400), redirect (Tr. 406-422), recross (Tr. 422-427), and redirect (Tr. 427-429); **Rossi** direct (Tr. 349-358), cross (Tr. 358-363); and **Langhamer** direct (Tr. 429-441) and cross (Tr. 441-455).

[13]     **Johnson** recall direct (Tr. 459-465), cross (Tr. 465-468).

[14]     The parties' proposed pretrial order lists the names of PX-1 through PX-90 (JA198-203).  Before the trial, the court received into evidence PX 1-85, 86, and 88-91 (and Exhibit D as a demonstrative) (JA8 (1/30/24 docket sheet entry)), repeated at the start of trial (JA263, Tr. at 3).  *See also* JA378 & JA463, Tr. 118 & 203 (reiterating PX-91 admitted) and JA716 & JA779, Tr. 456 & 519 (reiterating PX-95

Oral argument occurred on-the-record on July 21, 2024 (transcript at JA1572-1603) after which the parties submitted letter-briefs on loss causation and damages (plaintiffs at JA1523-1568; defendants at JA1569-1571).

### (c) Select Relevant Testimony

### (i) Witness & Testimony Overview

Maher testified for plaintiffs, mostly in support of the theories that plaintiffs lost, and to assert that if he knew about the Wall Street Pizza transactions he never would have invested in Global. Johnson testified for the defendants, as discussed herein.

Rossi was a registered representative who sold and recommended Global investments to his clients, and gave brief testimony, conceding that Global and AGF-II before it had been successful (JA622 & JA614, Tr 362:6, 354:24). Langhamer, as discussed, owned and operates Wall Street Pizza and confirms that the future receivables advances were

---

admitted). DX-1 was also admitted (JA634, Tr. 374). While PX 87 was not admitted into evidence, the court cites it (SA15), so we include it in the appendix. And while PX-94 (an article featuring Mr. Johnson) was not offered into evidence, Mr. Johnson gave testimony concerning it (JA510-511, Tr. 250-251), and we include it in the appendix (JA1496-1499).

fully collateralized by his AGF-II investments (JA705, Tr. 445:8-:12; JA693, Tr. 433:18-:24), among other of the contracted items.

### (ii) Specific Relevant Testimony

In addition to the above, there are specific points of testimony that explain the transactions. First, specific to the Future Receivables Purchase Agreement, there is no time component to it. As Mr. Johnson explained:

> So in a future receivables purchase agreement if you look back at the agreement, there is an estimated payment based on a percentage held of what the average receivables have been over the reviewable period during our due diligence. And that number can change based on sales volume from the merchant. So in theory if sales slowed down, that number can go down. And in theory if sales go up, we could petition for a higher payment. And there is a opportunity for the merchant to request a true-up to have that payment lowered based on the sale volume. So in essence, the payment that is made is a direct relationship to the sales volume to merchant. So if it takes ten years to pay back, it takes ten years. If it takes ten days to pay it back, it could take ten days, but there's no define time period, just the dollar amount that needs to be paid back.
>
> THE COURT: Excuse me. Can I ask a question. Is there an event of default that is tied to the failure to make the estimated payment?
>
> THE WITNESS: Only if we feel that the merchant is intentionally withholding funds from us by diverting them elsewhere.

32

(JA639-640, Tr. 379-380)

In the course of his direct testimony for plaintiffs, Mr. Johnson explained his relationship with his customers, working hand-in-glove with them over long periods of time, and the confidence he had in them that doesn't necessarily show in a spreadsheet:

> I understand the black-and-white way that an outside CPA has to look at [the business. But that] doesn't take into consideration my relationship with the merchants, my conversations with them. Some of these customers I have been doing business with for nearly a decade. So I had helped – I know their family names. I've been with them through their kids going through school. I helped grow their business substantially. So when times went tough, these people were not looking to hurt us. We had been there for them, and a lot of them wanted to get back on their feet. And when COVID subsided, they wanted to get back to paying.

(JA533, Tr. 273:3-:12).

> [These are] customers that I had a relationship with, that I had had conversations with and had been there for them through thick and thin over the years.

(JA534, Tr. 274:11-:13)

Somewhat disturbingly, during redirect of Mr. Johnson, plaintiffs' counsel and the court pressed him with questions pregnant with an assumption that a business lender must act predatory, eventually

33

punishing Mr. Johnson for his maintaining an ethical flexible financing

model that has kept him in the business with a successful customer

base for almost 30 years:

> Q. … I believe I heard you testify yesterday that the contracts that Global Factors had with its customers had no definitive timeframe?
>
> A. Correct.
>
> Q. So in determining whether or not a customer was in default, that would be a discretionary decision by Global?
>
> A. It could be partially discretionary, but there are a list of default events in the contract itself.
>
> Q. Is non-payment one of those defaults?
> . . .
> A. I guess it would depend on the reason for the non-payment.
>
> Q. Let's take a look at the Wall Street Pizza contract here. This is going to be Plaintiff's Exhibit 89 [JA1470-1480]. So this is the contract that we went through yesterday, correct?
>
> A. Correct.
>
> Q. So I want to draw your attention down here. It says, "The company shall in its sole and absolute discretion decide to either, one, debit a specified percentage of 25 percent of the merchant's settlement amounts due from each transaction daily or the "daily amount of $472.22" daily from said designated account."
> So Wall Street Pizza if I'm reading this right would have owed $472.22 a day on this agreement, correct?

A. Or 25 percent of the settlement amounts.

**THE COURT: I assume it would be in your interest to collect whichever of the two would be greater?**

**THE WITNESS: The greater amount is not always necessarily the deciding factor. It could be the consistency as well. Sometimes certain businesses have very lumpy revenues as opposed to a little bit more even keel where the percentage make more sense. Some businesses may have that are not retail businesses may have receivables that come in maybe only two or three times a week, and doing a fixed daily payment may not work for them.**

(JA666-668, Tr. 406:18-408:4 (emphasis added))

### 3.   The Court's Opinion & Order

The court issued its Opinion and Order entered July 8, 2024 (SA1-69), rejecting plaintiff's theories that defendants made actionable material misrepresentations concerning (A) Global's revenue profile (SA30-35); (B) Global's ability to meet its obligations to investors (SA35-39); and (C) the prior SEC action filed against Johnson, which culminated in a consent judgment (SA38-43).

The court though determined that the Wall Street Pizza transactions were "shams" (SA18).  Despite that the Wall Street Pizza agreements are each a "*FUTURE* RECEIVABLES PURCHASE

35

AGREEMENT" (JA1470-1480, JA1481-1493 (emphasis added)), the

court repeatedly excises the name and concept of "future" receivables

from its analysis, renames the signed agreements as "Receivables

Purchase Agreements" (SA18), mentions the concept of "future" only

three times in passing (SA18, SA50) in the 32 pages addressing the

Wall Street Pizza transactions (SA18-23, SA44-69), and then castigates

the defendants for agreeing to fund a business being constructed to

open in the near future:

> Wall Stret Pizza had not even opened for business at the
> time the receivables [sic – future receivables] agreements
> were entered into.  It would not open until nearly half a
> year later, on March 17, 2018. . . .  Langhamer did not
> provide any financial statements to Global Factors . . .
> because Wall Street Pizza did not have receivables on its
> books and was not obtaining receivables eight months
> prior to its opening.

(SA20 (transcript cites omitted)).

While the court recognizes that Langhamer had a more than

$2 million investment in AGF-II and that his balance there was reduced

by the amount Wall Street Pizza owed to Global on the $295,000

advances (SA21), the court ignores that that credit *was* the collateral –

as both Langhamer and Johnson testified (*e.g.*, JA705, Tr. 445; JA581-

584, Tr. 321-324).

The court addresses that reduction in AGF-II, including during the liquidation-conversion, as if there were something nefarious about it: "In other words, in 2021, Johnson unilaterally reduced Langhamer's balance owed from AGF II of $2.4 million by $295,000 and then reduced the remaining balance by 85%" (SA21). The first part of that statement reflects exactly how the collateral and agreement with Langhamer was meant to function. The second portion, addressing the 85% reduction, jumps to the post-Covid period, which is not a function of the Wall Street Pizza transactions but of the post-Covid adjustments to the portfolio as a whole as part of Global's liquidation. The court meshes the two, but without acknowledging their separate derivation.

The court misstates that "Johnson and AGF II did not honor his redemption request when he sought to withdraw his money from AGF II *because Johnson did not have the money to repay Langhamer from AGF II.*" (Op. 19 (emphasis added), *citing* JA695 & JA697, Tr. 435 & 437). There is no such testimony or evidence that AGF-II (or Johnson) lacked funds (pre-Covid) or that that was a reason for dishonoring Langhamer's redemption request.

37

Rather, both Johnson and Langhamer testified that he was *late* in his redemption request(s). According to Johnson:

> And he came to me at the last minute during these issues that were arising in the midst of this buildout and said he needs access to his AGF investments, and I informed him that there were no available windows for redemption. There were some that had recently passed that he had missed, and there were some coming down in the future, but even ones that were coming in the future were maybe six, seven months away. That's just the notice period. Then it's six months to the redemption date, then it's three more months to the disbursement date. So that's well over a year out, maybe more. And he said to me, I simply can't wait that long for the money. I need it. The business is in trouble. I can't – I have no other money. This is the only money I have. And I said, Well, you're not eligible for a redemption request that would happen immediately. That's not how it works. And he asked me if I can make an exception in his case. We go back a long way. I said, Randy, I would love to help you. I cannot do that. It's not fair to other investors who may have requested redemptions in an emergency situation that I've turned down. We have to go by the redemption clause in the subscription agreement.

(JA721-722, Tr. 461-462)

Langhamer admitted as much:

> Q. Isn't it true, Mr. Langhamer, that the reason you couldn't get paid from AGFII was you missed the time to ask for redemption?
>
> A. First time.
>
> Q. What do you mean by first time?

38

> A. Well, I had been asking for money prior to January of '18, and he said I missed the cutoff. So what I did that could assure this wouldn't happen again, for the next four or five months starting January of 2018, I believe right through maybe May or July, I kept sending emails, Please be advised, do not rollover or reinvest any of the Langhamer accounts. In one email indicated except for my IRA, which I couldn't touch anyway. So I gave him at least six months to 12 months to let him know what I was looking for. . . .

(JA713-714, Tr. 453-454)

If, as Langhamer testified, he started asking for redemptions in January 2018, and they could take at least six to 12 months to transpire (or more as Johnson testified), that means that he was too late to redeem his funds for the earlier July 2017 Wall Street Pizza agreement (JA1470-1480), likely as well for the August 2018 agreement (JA1481-1493), and the dates of the other agreements were never exactly established.

Moreover, when defendants' attorney Mark Astarita tried to obtain clarity on the timing of the redemption requests and which were timely ("Q. . . . I keep asking you about redemptions and you keep talking about dividend rollovers" (JA715, Tr. 455:7-:8)), the court cut

him off stating "I don't think his testimony is ambiguous at all. Next question" (JA715, Tr. 455:9-:10)).[15]

The court also states that there "is no evidence that AGF II treated the monies it owed to Langhamer as monies owed to Global Factors," and that "[i]t simply reduced the amount AGF II owed Langhamer by the amount it had already paid him from Global Factors" (SA22-23). But plaintiffs in their direct case nowhere addressed or probed whether the Wall Street Pizza receivable was ever credited to Global, no less prove that it was not. The only evidence in the case concerning it is Johnson's unrebutted testimony on defendant's case that "the receivable from Wall Street Pizza was credited at full actual value as having been fully collateralized and Propellus paid the Global shareholders for it at 100% of value, unimpaired" (JA723, Tr. 463; JA726, Tr. 466).

_____

[15]     Langhamer also gave vague (and unsupported) testimony that Johnson refused his redemption request, Johnson saying he "flew too close to the sun, and he wasn't raising money for AGF at the time" (JA709, Tr. 449), which is more likely, or at least equally consistent with, Johnson explaining not wanting to breach the AGF agreements and make an exception for Langhamer or not wanting to make new loans out of AGF-II than not having funds.

For its conclusions of law, the court set forth the law for Exchange Act claims (SA23-30), including the requirement for plaintiffs to prove loss causation (SA29-30). The court rejected plaintiff's principal claims for recovery, *i.e.*, alleged representations *not* relating to Wall Street Pizza (SA30-43).

But having completely misconstrued the evidence concerning Wall Street Pizza, the court ruled against defendants on that aspect, determining that plaintiff carried their burden of establishing liability under the Exchange Act (SA44-56). According to the court, plaintiffs intentionally misrepresented Global's business as involving fully collateralized contracts rather than a diversion of $295,000 covering Johnson's obligations with respect to another business (SA44-46); the amount was "not an immaterial number," representing one-half of what Global represented to be the excess of assets over liabilities on its financial statements (SA46); defendants acted with scienter (SA47); and plaintiffs reasonably relied on the representations (SA47-50).

The court determined that plaintiffs had also carried their burden of demonstrating loss causation (SA51). While the immediate cause of plaintiffs' loss was the suspension of dividends due to the Covid

41

pandemic (SA52), the court rejected that the loss was caused by the

pandemic (SA53), which it viewed not as an intervening event (SA54).

In the court's view, which we believe to be at best exaggerated, because

some assets were false, the investment as a whole was misrepresented

(SA55-56).

Based on the court's faulty foundation, it determined that Johnson

was liable as a control person under Section 20(a) of the Exchange Act

(SA56-58), and that plaintiffs made out their claim against defendants

for common law fraud, even applying its higher burden of proof by clear

and convincing evidence (SA58-60).[16]

Turning to damages, the court found that plaintiffs were entitled

to rescissory damages because they were induced to buy and invest for

some future growth (SA64-65), recognizing that "[s]uch damages are to

be awarded only in extraordinary circumstances, where the breach is

bound to be material and willful, or if not willful, so substantial and

fundamental as to strongly tend to defeat the object of the parties in

making the contract" (SA65 (source citations and internal quotes

---

[16]    The court rejected plaintiffs' negligent misrepresentation claim for
reasons not pertinent here (SA60-63).

omitted)).  In the court's view, defendants diverted a significant portion of the entity's assets with no expectation that they would generate value for Global's unitholders (SA66).  The court did so recognizing that such award risks plaintiff receiving more in damages that the differernce in values between what they paid and what they were worth, but that it is more appropriate to give the defrauded party the benefit of a windfall than to let the defrauding party keep them (SA66-67).

The court thus awarded "the difference between the amount Plaintiffs invested and the amount realized when Plaintiffs sold the securities back to Defendants, reduced by the cash income received as distributions while Plaintiffs owned the units" (SA67).[17]  As plaintiffs had invested $1,002,000 in Global and received $106,432.17 in liquidation payments from Global, they were awarded $828,917.83 against the defendants joint and severally (SA69).

---

[17]     The court denied plaintiffs prejudgment interest (SA67-69), a determination nobody has appealed.

43

4.    **The Judgment and This Appeal**

Judgment entered on July 9, 2024, awarding plaintiffs

$828,917.83 against the defendants jointly and severally (SA70).  Only

defendants appealed, filing their Notice of Appeal timely on August 5,

2024 (SA71).

## SUMMARY OF ARGUMENT

POINT I (SUMMARY):

The district court misconstrued the evidence and clearly erred in

determining that Global's advances of $295,000 to Wall Street Pizza

were improper and that the failure to disclose to plaintiffs constituted a

material omission.  It is undisputed that the receivables were fully

collateralized by Langhamer's over $2 million investment in Johnson's

other fund, which Johnson controlled. The court's skepticism over the

advancing of funds to a business about to open that has no receivables

ignores that these were *future* receivables agreements, and more so,

fully collateralized.

The court overlooks the subsequent effect of the Covid pandemic

on the portfolio, ironically as the only evidence offered concerning the

transpiring of the Wall Street Pizza receivable was Johnson's

unrebutted testimony on defendants' case that at all times the debit to Langhamer's account and receivable of Wall Street Pizza on Global's accounts were intact and fully credited to Global during the post-Covid liquidation.

POINT II (SUMMARY):

Plaintiffs failed to prove loss causation, which must also account for intervening causes and assess damages proportional to the wrong ascribed. As noted above, plaintiffs failed to offer evidence that Global did not receive the benefit of the Wall Street Pizza receivables. The full rescissory damages awarded wrongly overly benefits plaintiffs by undoing any losses they would have suffered from the economic effects of the Covid pandemic even had the investment been as represented and expected.

Nor was the award properly proportional. The challenged receivables advanced were $295,000 out of Global's $14.4 million portfolio of advances, or only two percent. A proportional award would have been two percent of their investment, or $20,400. Also, they were not the only investors in Global, their investment comprising six

45

percent of total member investment. Allocating their share of the $295,000 loss bears only $17,700.

Finally, it was not reasonably foreseeable to defendants when the fully-collateralized $295,000 was advanced that the loss and damages would equate to having to pay back the plaintiffs' full investment ($1,002,000 minus distributions), or the $828,917.83 adjudged.

## THE STANDARD OF REVIEW

On an appeal from a bench trial, conclusions of law are reviewed *de novo*, findings of fact for clear error, and mixed questions of law and fact under either the *de novo* or clearly erroneous standard, depending on whether the question is predominantly legal or factual. SEC v. Rashid, 96 F.4th 233, 240 (2d Cir. 2024).

Whether the court applied the correct method in calculating damages is a question of law reviewed *de novo*. MVP Health Plan, Inc. v. OptumInsight, Inc., 765 F. App'x 615, 618 (2d Cir. 2019); Lauder v. First Unum Life Ins. Co., 284 F.3d 375, 379 (2d Cir. 2002).

## ARGUMENT

## I.

## THE DISTRICT COURT CLEARLY ERRED IN DETERMINING THAT THE FUTURE RECEIVABLES AGREEMENTS WERE A SHAM AND ERRED IN DETERMINING THAT ANY FAILURE TO DISCLOSE CONSTITUTED A MATERIAL OMISSION

As we show below, the court grossly misconstrued the evidence and made findings for which searching review shows there was no evidence and substituted its own business judgment for that of Global's management. It also erred in determining that any failure to disclose this particular arrangement with Wall Street Pizza was material.

Global's business was the funding of small businesses through accounts receivable financing, enabling them to grow. The PPM authorizes a wide array of possible financing products and provides management great flexibility in the types of advances and agreements that may be made (*e.g.* JA54-55 (offers "small businesses a variety of financing alternatives including payroll advances directly and through third-party professional employer organizations, accounts receivable factoring, short-term line of credit loans, and other types of loan products and cash flow financing in the discretion of the Manager")),

47

including conflicted arrangements with affiliates (*e.g.*, JA43, JA46, JA50).

When Langhamer needed funds to build out his Wall Street Pizza restaurant, but missed the redemption periods for his various AGF-II investments (JA713-714, Tr. 453-454; JA721-722, Tr. 461-462), Global through Mr. Johnson offered to purchase relatively nominal amounts of Wall Street Pizza's future receivables, and entered into various Future Receivables Purchase Agreements (JA1470-1493). Pursuant to them Global advanced $295,000 – *collateralized by Langhamer's more than $2 million equity in AGF-II, as both Johnson and Langhamer testified, unrebutted* (*e.g.*, JA715, Tr. 445; JA581-584, Tr. 321-324).

It is thus perplexing that the court writes:

> Wall Street Pizza had not even opened for business at the time the receivables agreements were entered into. It would not open until nearly half a year later, on March 17, 2018. As a further demonstration of the sham nature of the agreements, Langhamer did not provide any financial statements to Global Factors. . . . Wall Street Pizza did not have receivables on its books and was not obtaining receivables eight months prior to its opening. In fact, Wall Street Pizza has no receivables, so it is implausible that Johnson and Global Factors reached an agreement to extend financing to Wall Street Pizza for its receivables. Ultimately, it never received any receivables. Additionally, while the agreements stated that Global Factors would have collateral on other assets of the

48

"merchant," there was no discussion of what other assets
Wall Street Pizza possessed at the time of contract
execution.

(SA20 (transcript citations omitted)).

There is no dispute that Johnson had control over Langhamer's
AGF-II funds, the court conceding that "Johnson reduc[ed] on the books
of AGF II the amount that that entity owed Langhamer by the amount
Johnson had paid Langhamer from Global Factors" and indeed "reduced
Langhamer's balance owed from AGF II of $2.4 million by [the]
$295,000" (SA21).

While the court expresses that there were no receivables, it failed
to consider the *future* receivables. *See, e.g.*, Itria Ventures LLC v.
Chadha (In re Chadha), 598 B.R. 710 (Bankr. E.D.N.Y. 2019) (debtor
restaurant entered into future receivables sale agreements for "facelift"
remodeling of its La Bottega restaurant); CAP CALL, LLC v. Foster (In
re Shoot the Moon, LLC), No. 2:15-bk-60979-WLH, 2020 Bankr. LEXIS
3157, at *2-*3, *17 n.46 (Bankr. D. Mont. Nov. 6, 2020) (addressing
"future" receivables agreements with entities that operated restaurants
in various states, *i.e.*, "payments made by restaurant customers after
the transactions closed"). There is no dispute that Wall Street Pizza

49

upon opening did have receivables (JA710 & JA720, Tr. 450 & 460). The court also failed to address, or reconcile its conclusions with, Johnson's expressed long-term business outlook in regard to the customer base (JA533-534, Tr. 273-274; JA639, Tr. 379; JA666-668, Tr. 406-408).

Even so, the receivables are almost irrelevant to the arrangement as the collateral was so substantial and available, under Johnson's (and thus Global's) control. In pre-Covid worldview, that collateral was in-hand and plentiful. Nobody but nobody imagined a once-in-a-century pandemic, a business nuclear bomb that would cut across the customer base such that all bets were off.

Even the insurance industry was unprepared for the occurrence of a global pandemic, their insurance policies failing even to account for such an event. *Compare, e.g.*, Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co., 217 Vt. 195, 287 A.3d 515 (2022) (insurance policy covering direct physical loss or damage to property *did* cover losses from COVID-19 under Vermont law), *with* Another Planet Entm't, LLC v. Vigilant Ins. Co., 15 Cal. 5th 1106, 1117, 320 Cal. Rptr. 3d 843, 848-49, 548 P.3d 303, 307 (2024) (commercial property insurance policy requiring

50

physical loss or damage to property did *not* cover losses from COVID-19 under California law). Similarly, the loss-causation intervening-cause cases debate over events that *could* have been in contemplation, such as a change in oil and gas prices, Bastian v. Petren Res. Corp., 892 F.2d 680 (7th Cir. 1990), *cert. denied*, 496 U.S. 906 (1990), or other sudden phenomena part of the human experience – not an across-the-spectrum event unprecedented in modern times.

Applying that to Wall Street Pizza, even had the Langhamers been hit by a truck, Global was secured, seemingly so. The court expresses that AGF-II had insufficient funds, but as shown above (procedural history addressing the opinion), there is just no evidence of that or evidence from which that reasonable inference might be drawn. Or any evidence tying such notion to the pre-Covid period as opposed to post-Covid. And if the AGF-II funds were available and meant for Global prior to the onset of Covid, but diverted and/or not credited afterwards, then there was no materiality or fraud in the inducement or basis for recission.

Finally, while the court appears to assume that the Langhamer AGF-II funds covering the Global advances was never credited to

Global, the only evidence concerning that was Johnson's unrebutted testimony on defendant's case that "the receivable from Wall Street Pizza was credited at full actual value as having been fully collateralized and Propellus paid the Global shareholders for it at 100% of value, unimpaired" (Tr. 463, 466). Plaintiffs in their direct case nowhere addressed or probed that subject, no less proved that it was not.

As such, there was insufficient evidence for the court's determination that the Wall Street Pizza transactions were a sham and material such that had they been disclosed, Maher never would have invested.

## II.

### PLAINTIFFS FAILED TO PROVE LOSS CAUSATION AND THE COURT ERRED BY DETERMINING RECISSORY DAMAGES

As the district court recognized, the proximate cause requirement means that plaintiffs must demonstrate a causal link between the alleged misconduct and the economic harm suffered (SA29-30). A plaintiff therefore must prove both transaction causation and loss causation. For loss causation, a plaintiff must prove both that the loss

(i) was caused by the materialization of the risk concealed and (ii) was foreseeable (Op. 30, *citing* Liu v. Credit Suisse First Bos. Corp. (In re Initial Pub. Offering Sec. Litig.), 399 F. Supp. 2d 298 (S.D.N.Y. 2005) (reconciling cases), *aff'd sub nom.* Tenney v. Credit Suisse First Bos. Corp., Nos. 05-3430-cv, 05-4759-cv, 05-4760-cv, 2006 U.S. App. LEXIS 13050 (2d Cir. May 19, 2006) (summary order)).

Loss causation must also take into account intervening causes, such as outside market factors, and the "magnitude" of the misstatements in view of those intervening forces. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994), *citing* Brandenburg v. Seidel, 859 F.2d 1179 (4th Cir. 1988). "[W]hen factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." First Nationwide Bank, 27 F.3d at 769.

Any damages assessed must bear some proportionality to the wrong ascribed. Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC, No. 20-2805-cv, 2022 U.S. App. LEXIS 1271 at *5 (2d Cir. Jan. 18, 2022) (summary order) (where outside economic forces

could have contributed to plaintiffs' loss, damages ascribed have "some rough proportion of the whole loss to [defendant's] misstatements" (quotation source omitted)).

In First Nationwide Bank, plaintiff alleged that the borrowers fraudulently undervalued real estate provided as collateral for loans. The outside force there was a downturn in the real estate market. This court affirmed the dismissal of the complaint, finding fault with plaintiff's damage analysis, stating "we are unable to tell accurately whether the alleged misrepresentations 'substantially' overstated the value of the collateral properties because [the] complaint provides no reliable measure of the alleged misrepresentations." The pleading "failed to provide any 'order of magnitude' for the misrepresentations to support [plaintiff's] assertion that they were material" and "the bald assertion that misrepresentations were material is not a fact." 22 F.3d at 769.

As we show here, plaintiffs fail both prongs of loss causation: the loss and damages assessed were not caused by or proportional to the risk concealed and were not reasonably foreseeable.

54

A.    **The Loss and Damages Assessed Were Not Caused**
      **By or Proportional to the Risk Allegedly Concealed**

The first and profound fault with the court's analysis here is that it exonerates and immunizes the plaintiffs from the economic effects of the Covid pandemic. The premise of plaintiffs' case is that they meant to invest in accounts receivable factoring of small businesses as described, just not *this* one, which they claim was not as described.

There can be no question that the COVID-19 pandemic had a massive adverse impact on small businesses all around:

> Beginning in late 2019 and early 2020, the spread of the coronavirus led to a global pandemic with devastating impacts worldwide. In addition to the severe consequences for human health and mortality, many business owners and the economy at large suffered tremendously. According to a report by the World Bank, the COVID-19 pandemic triggered "the largest global economic crisis in more than a century.

Consol. Rest. Operations, Inc. v. Westport Ins. Corp., 41 N.Y.3d 415, 423, 211 N.Y.S.3d 800, 802 (2024) (denying insurance coverage); *see also* 10012 Holdings, Inc. v. Sentinel Ins. Co., 21 F.4th 216 (2d Cir. 2021) (denying insurance coverage, and observing an "all too familiar" scenario during pandemic of businesses forced to suspend operations).

The burden was on plaintiffs to account for the impact of the Covid pandemic.  Judge Posner explains this in Bastian, *supra*, 892 F.2d at 684, under analogous circumstances, affirming dismissal of a case affected by the 1980s downturn in oil and gas prices:

> [Plaintiffs] wanted to invest in oil and gas limited partnerships; they only wanted to be sure that the general partners were honest and competent people. . . . If the alternative oil and gas limited partnerships to which these plaintiffs would have turned had the defendants leveled with them were also doomed, despite competent and honest management, to become worthless, the plaintiffs were not hurt by the fraud; it affected the place but not the time or amount of their loss.

> [A]ll that the plaintiffs had to do was to obtain evidence from persons knowledgeable about oil and gas ventures in the early 1980s that many or most oil and gas ventures had succeeded notwithstanding the downturn in price after 1981.

*That* the Maher plaintiffs here did not and could not do.  "If the plaintiffs would have lost their investment regardless of the fraud, any award of damage to them would be a windfall." Bastian, *supra*, 892 F.2d at 684-85.

Here the loss to the investments was not complete, but surely the proportion attributable to the Covid pandemic was by any measure massive. The court's blanket rescissory award to plaintiffs fails to

account for the Covid pandemic and derives solely from, and rewards plaintiffs for, their failure of proof or even attempt of proof concerning Covid's effect on the investment or industry.

Even assuming that plaintiffs had not failed in their proof, the court's analysis fails the proportionality test also by overlooking that the $295,000 constitutes only approximately *two percent* of the $14.4 million in customer advances (SA-8, *citing* JA980-JA981) ($295,000 ÷ $14,400,000). Even ignoring the devastating financial effects of Covid, recompensing the Mahers two percent of their $1,002,000 investment bears only $20,040.

Similarly, Maher was not the sole investor in Global. Just as any reward from the Wall Street Pizza advances would have inured to the benefit of the Global investors as a whole, and not just to Maher, so too would any loss be allocated *pro rata*.

As the court observes (SA7), before Maher invested, the investor balance was $13,757,967.13 (JA970), as reflected on a June 2018 ending balance shapshot (JA966). Following Maher's last-quarter 2018

investments, members equity reflected as $16,691,189 (JA1302),[18] making his share *six percent* of the total members investment ($1,002,000 ÷ $16,691,189). Allocating the loss from the $295,000 Wall Street Pizza advances across the investor base results in only $17,700 attributable to Maher.

Finally, this damages analysis applies only on the assumption that plaintiffs have proved their case, which as we demonstrated above they have not, the plaintiffs never having even addressed on their direct case what had occurred in regard to Lanhamer's AGF-II credit. On plaintiff's case the trail just went cold. The only evidence concerning it came on defendants' case from Johnson, who testified unrebutted that the Langhamer collateral for the Wall Street Pizza advances were kept on the books at 100% and Global investors given full credit for the receivable, undiluted (JA723-724 & JA726, Tr. 463-464 & 466).

## B.     The Loss and Damages Assessed Were Not Reasonable Foreseeable

Plaintiffs have failed to prove loss causation also because the loss

---

[18]     Global Factors Financial States & Supplementary Information with Independent Auditors' Report for the Years ended December 31, 2018 and 2017 (JA1298-1317).

from the acts alleged was not reasonable foreseeable. It is undisputed that the Langhamers needed funds for opening their Wall Street Pizza and that the advances from Global were fully collateralized many times over by the balance due Langhamer from AGF-II, under Johnson's control. There was nothing untoward about providing such an advance for future receivables to a business about to open.

This is a parable of no good deed goes unpunished. The good deed here though is not inconsistent with sound business judgment, and there is nothing in the arrangement that can be deemed as such.

And as shown above, there was either no loss to Global because the Wall Street Pizza advances, fully collateralized, were paid, or at worst there was collateral that unfortunately *due to Covid* became impaired. Either way, there was nothing that could be deemed reasonably foreseeable at the time to undermine and undo the Mahers' investment, no less immunize them from the economic effects of the eventual Covid pandemic, and allow them to recover their investment in full.

## <u>CONCLUSION</u>

This Court should reverse the Judgment and reduce the damages amount or remand to the district court for a new trial and/or for redetermination of damages, with costs.

Dated:        November 18, 2024

Respectfully submitted,

/s/ *Brian D. Graifman*
Brian D. Graifman, Esq.
BORAH, GOLDSTEIN, ALTSCHULER,
 NAHINS & GOIDEL, P.C.
377 Broadway, 6th Floor
New York, N.Y. 10013
(212) 431-1300 x322
bgraifman@borahgoldstein.com

*Attorney for Defendants-Appellees*
 *Global Factors, LLC and Ralph*
 *C. Johnson*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this document complies as follows:

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,321 words.

2.    The document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-still requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14 point Century Schoolbook font. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: November 18, 2024

*/s/ Brian D. Graifman*
Brian D. Graifman